1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   RONALD A. ROGERS,                    )   Case No.: 1:09-cv-01298-BAM (PC)
                                          )
12                 Plaintiff,             )   ORDER GRANTING DEFENDANTS' MOTION
                                          )   FOR SUMMARY JUDGMENT
13          v.                            )   (ECF No. 31)
                                          )
14   CHRIS GRIJALVA, et al.,              )
                                          )
15                 Defendants.            )
                                          )
16   _____ )

17

18          **I.      Background**

19          Plaintiff Ronald A. Rogers ("Plaintiff") is a civil detainee proceeding pro se and in forma

20   pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff is currently detained at

21   Coalinga State Hospital in Coalinga, California.  This action proceeds on Plaintiff's first amended

22   complaint, filed on May 12, 2010, against Defendants Chris Grijalva, Jose Perez and John Sanzberro

23   for conducting unreasonable searches of Plaintiff's person and property in violation of the Fourth

24   Amendment; and against Defendant Grijalva for excessive force, involuntary administration of

25   medication and punitive conditions of confinement in violation of the Fourth and Fourteenth

26   Amendments.  (ECF Nos. 14, 15, 16.)  The parties have consented to Magistrate Judge jurisdiction.

27   (ECF Nos. 8, 27.)

28

                                                    1

1    Currently pending before the Court is Defendants' motion for summary judgment filed on

2    August 10, 2012.[1]  (ECF No. 31.)  On January 2, 2013, Plaintiff filed an opposition to the motion for

3    summary judgment, and Defendants replied on January 7, 2013.  The motion is deemed submitted.

4    Local Rule 230(l).

5    **II.    Legal Standard for Summary Judgment**

6    Pursuant to Federal Rule of Civil Procedure 56(a) summary judgment is appropriate when the

7    movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

8    judgment as a matter of law.  Summary judgment must be entered, "after adequate time for discovery

9    and upon motion, against a party who fails to make a showing sufficient to establish the existence of

10   an element essential to that party's case, and on which that party will bear the burden of proof at trial."

11   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the court is to liberally construe the

12   filings and motions of pro se litigants.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The

13   "party seeking summary judgment always bears the initial responsibility of informing the district court

14   of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

15   interrogatories, and admissions on file, together with the affidavits, if any, which it believes

16   demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323 (internal

17   quotations and citations omitted).

18   If the moving party meets its initial responsibility, the burden then shifts to the opposing party

19   to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co.

20   v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this

21   factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to

22   tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

23   support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586

24   n.11.

25

26

27   _____

[1]    Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for
28   summary judgment.  (ECF Nos. 31, 32.); see Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154 F.3d
     952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record for consideration.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The Court will not undertake to scour the record for triable issues of fact.  Simmons v. Navajo County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection.  This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

A.      **Summary of Relevant Allegations in First Amended Complaint**

Plaintiff alleges that on January 29, 2009, Defendants Jose Perez and Chris Grijalva, along with Julio Zuniga (not named as a defendant in this action), entered Plaintiff's room at 1:30 p.m. and awakened him while conducting a routine weekly search.  Plaintiff alleges that he is a "day sleeper" and has repeatedly asked staff at Coalinga State Hospital to refrain from awakening him during the day.  Plaintiff contends that the "lack of sleep is literally killing plaintiff." (ECF No. 14, First Am. Compl. ¶ 17.)

Plaintiff alleges that a few days earlier, Defendant Perez intentionally awakened Plaintiff by knocking on his door and calling out his name very loudly. When Plaintiff did not respond, Perez approached Plaintiff in his bed and screamed Plaintiff's name and told him that someone named Ruben wanted to talk to him.

Plaintiff alleges that on January 31, 2009, Defendants Grijalva and Perez awakened him again while searching the area around his bed. Perez was on his knees searching bags of food underneath Plaintiff's bed while Grijalva was on the other side of Plaintiff's bed searching a locker.  A third staff member was standing at the foot of Plaintiff's bed. Plaintiff cursed at Defendants for waking him up then left to use the restroom. When Plaintiff returned, the Defendants were still searching Plaintiff's property. Plaintiff claims "there was no one overseeing the illegal search, not even Ward Government

members as required." (ECF No. 14, First Am. Compl. ¶ 27.)  Plaintiff then overheard Defendant Perez on the telephone asking the medical department about Plaintiff's prescription for a walking cane. Perez claimed that the prescription had not been renewed by a doctor and seized the cane, causing Plaintiff to "limp[] around, moving only when he is forced to do so." (First Am. Compl. ¶ 31.)

Plaintiff alleges that on March 3, 2009, he found Defendant Grijalva alone in his room at around 2:00 p.m., searching under Plaintiff's bed and tampering with Plaintiff's property. When Plaintiff entered the room, Grijalva appeared startled and quickly left.

Plaintiff alleges that on May 17, 2009, a medical nurse informed him that he was scheduled for an outside medical appointment the next morning. However, when Plaintiff was informed that he would be transported to his medical appointment by correctional officers from the California Department of Corrections and Rehabilitation, Plaintiff refused to go. Despite the fact that Plaintiff's appointment was cancelled, on May 18, 2009, Defendant Grijalva came to Plaintiff's bed at 8:40 a.m. and awakened him for the appointment.

Plaintiff contends that Grijalva knew that the appointment had been canceled and that Grijalva "appeared to be showing a perverse smile on his face as he awoke plaintiff." (ECF No. 14, First Am. Compl. ¶ 44.)  Plaintiff cursed at Grijalva for intentionally disturbing his sleep and went to the unit supervisor's office. However, the supervisor was not there and on the way back to his room, Plaintiff continued to curse at Grijalva. Two minutes after Plaintiff returned to bed, Grijalva entered Plaintiff's room with psych tech Darla Ainsworth and announced that he would search Plaintiff's bed area again. Five other staff members were summoned by Grijalva to conduct the search. Plaintiff attempted to sleep but Grijalva asked him to get up so they could search under his mattress. Plaintiff believed that he was being harassed and retaliated by grabbing a cup of water and throwing it at Grijalva. All the staff members in the room then tackled Plaintiff and placed him in restraints. Plaintiff stated that he would not resist and asked for the restraints to be removed, but Grijalva denied his request. Plaintiff was then placed in seclusion and was searched by Grijalva.  Grijalva "pulled down plaintiff's pants, pulled out plaintiff's underwear, reached down and grabbed plaintiff's penis, then scrotum, and finally penetrated plaintiff's rectum." (ECF No. 14, First Am. Compl. ¶ 60.)  Plaintiff's mechanical restraints were then removed.

Plaintiff requested a blanket because the temperature in the seclusion room was less than sixty degrees Fahrenheit. An unidentified defendant refused Plaintiff's request and Plaintiff was forced to curl up on a mattress on the floor with his arms inside his shirt for warmth. Plaintiff was not given anything to eat or drink for six hours while in the seclusion room.

At some point, Plaintiff had to urinate, so "he tried to lay [sic] on his side to enable urination." (ECF No. 14, First Am. Compl. ¶ 65.)  However, "Grijalva and other staff came into the seclusion room and tightened plaintiff's mechanical restraints even more; so much more in fact that . . . plaintiff's breathing was labored." (ECF No. 14, First Am. Compl. ¶ 65.)  After Grijalva and the other staff left, Plaintiff urinated on the floor. Staff immediately returned to mop up the urine.

A few minutes later, Grijalva and other staff re-entered the seclusion room and prepared Plaintiff's arm with an alcohol pad. A female staff member attempted to stick a needle in Plaintiff's arm, but Plaintiff twisted his arm away. However, staff overcame Plaintiff's resistance and drew blood from Plaintiff without his authorization.  Plaintiff also alleges that he was involuntarily injected with some kind of sedative, causing him to fall over and injure his head. Plaintiff alleges he was unconscious for most of the next two days due to the sedative.

Plaintiff was interviewed by a psychiatrist and other staff members over the next few days. Plaintiff claims that the interviews caused him to realize that the incidents over the past few days were "a ruse to intentionally upset plaintiff, so that plaintiff would become enraged." (ECF No. 14, First Am. Compl. ¶ 76.)  Plaintiff also contends that Grijalva was intimidating him into withdrawing a previous assault complaint Plaintiff had filed against Defendant Perez.

The Court determined that Plaintiff's allegations stated a cognizable claim against Defendants Chris Grijalva, Jose Perez and John Sanzberro for conducting unreasonable searches of Plaintiff's person and property in violation of the Fourth Amendment; and against Defendant Grijalva for excessive force, involuntary administration of medication and punitive conditions of confinement in violation of the Fourth and Fourteenth Amendments.

**B.    Statement of Undisputed Material Facts ("UMF")**

Despite receiving notice of the requirements for opposing summary judgment, Plaintiff failed to file a separate statement of disputed facts or statement admitting or denying the facts set forth by

Defendants as undisputed.  Local Rule 260(b).  Accordingly, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified first amended complaint. Jonas v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

*Defendants' Statement*

Since 1982, Plaintiff has been primarily in the custody of the California Department of Corrections and Rehabilitation ("CDCR") of the California mental health system, as a result of multiple felony sex crime convictions.  (ECF No. 31-5, Plaintiff's Dep. p. 8.)  Plaintiff currently is a patient confined at Coalinga State Hospital ("CSH"), pursuant to California's Sexually Violent Predators ("SVP") Act.  (Plaintiff's Dep. p. 8; ECF No. 31-1, Sanzberro Dec. ¶ 3.)  In 2009, Plaintiff was housed in a 4-man dorm in Unit 2 at CSH.  (Sanzberro Dec. ¶ 3.)  At that time, Defendant Sanzberro was a Unit Supervisor in Unit 2; Defendant Perez was a Senior Psychiatric Technician; and Defendant Grijalva was a Psychiatric Technician.  (Sanzberro Dec. ¶ 2; Perez Dec. ¶ 2; Grijalva Dec. ¶ 2.)

Rogers has a documented history of being verbally abusive with CSH staff, for example:  On January 27, 2009, Plaintiff yelled profanities at the unit nurse and kicked the door stating: "Fuck you! You're suppose [sic] to have somebody in this fucking med room 24-7!  Why the fuck isn't anybody in there!"  (Sanzberro Dec. ¶ 9; ECF No. 31-4, Ex. D p. 1.)  On January 30, 2009, Plaintiff screamed at staff for waking him up.  (Sanzberro Dec. ¶ 10.)  On February 14, 2009, Grijalva confiscated one gallon of pruno from under Plaintiff's bed during a search, and Plaintiff screamed obscenities at Grijalva.  (Sanzberro Dec. ¶ 13; Grijalva Dec. ¶ 13.)  On May 18, 2009, psychiatric technician Rubalcava confiscated five pounds of pruno from Plaintiff's living area, and Plaintiff threw a cup of liquid at Grijalva and cursed at Grijalva.  (Sanzberro Dec. ¶ 15; Grijalva Dec. ¶ 14.)  According to Plaintiff, the room searches are "unconstitutional" and done just to harass him.  (ECF No. 31-5, Plaintiff's Dep. p. 15.)

Plaintiff became very agitated when his room was subject to search; and Plaintiff became angry when he was woken up during daytime searches.  (Perez Dec. ¶ 8; Grijalva Dec. ¶ 9; First Am.

Compl.)  Plaintiff was known to make pruno, a type of homemade alcohol which is considered

contraband to be confiscated by staff during room searches.  (Perez Dec. ¶¶ 7-8; Grijalva Dec. ¶ 12.)

Plaintiff became angry when his pruno was confiscated during searches in February and May of 2009.

(Sanzberro Dec. ¶¶ 13, 15; Grijalva Dec. ¶¶ 13, 14; ECF No. 31-4, Ex. D pp. 12-13, 19-21.)

Room Search Practices

At the time of admission and orientation to CSH, each patient is instructed as to the room

search policy, including which items are considered "contraband" to be confiscated by CSH staff.

(Sanzberro Dec. ¶ 4.)  When items are confiscated, patients are given a receipt for the confiscated

contraband property.  (Sanzberro Dec. ¶ 4.)  Room searches for contraband items at CSH are

conducted on a purely random basis.  (Sanzberro Dec. ¶ 5.)  In order for the contraband search to be

effective, it is essential that the search be without warning; if a patient were to be warned as to an

upcoming search they could avoid confiscation by having another patient hold their contraband

property.  (Sanzberro Dec. ¶ 5; Grijalva Dec. ¶ 5.)  Examples of contraband items include homemade

alcohol called "Pruno," drugs, makeshift weapons, child pornography, tobacco, among others.

(Sanzberro Dec. ¶ 5; Grijalva Dec. ¶ 4.)

On a Sunday through Saturday schedule, each patient's room area could be searched up to two

times randomly.  (Sanzberro Dec. ¶ 6.)  Every individual is first of all subject to one random search

per week.  (Sanzberro Dec. ¶ 6.)  Additionally, one patient per week is randomly drawn for a unit

search.  (Sanzberro Dec. ¶ 6.)  More searches may be conducted in the event that there is cause to

believe the patient is in possession of contraband.  (Sanzberro Dec. ¶ 6.)  A search "for cause" will be

conducted regardless of the hour or inconvenience, and regardless of whether the patient was already

randomly searched that week.  (Grijalva Dec. ¶ 6.)

No part of the patients' living area is off limits for staff-conducted contraband searches; this

includes their bed, underneath the bed and in lockers. (Sanzberro Dec. ¶ 7.)  Patients may choose to be

present during the search, or to have a member of the ward government be present on their behalf.

(Id.)

There are times when a sleeping patient may be disturbed during hourly safety and security

rounds at CSH, for example if staff cannot determine the well-being of an individual then staff must

remove their blanket to make sure the patient shows signs of life. (Sanzberro Dec. ¶ 8.) In addition, if an individual chooses to sleep during the day, the individual may be inadvertently disturbed if a random search is being conducted on one of their three dorm-mates. (Id.)

Sanzberro did not discriminate among patients when performing random contraband searches in Unit 2. (Sanzberro Dec. ¶ 6.)  Sanzberro was not present during any of the room searches alleged in the complaint. (ECF No. 31-5, Plaintiff's Dep. p. 35.)  Perez did not discriminate among patients when performing contraband searches in Unit 2. (Perez Dec. ¶ 6.)  Grijalva did not unfairly discriminate among patients when conducting any room searches; he conducted each search lawfully, and according to CSH policy. (Grijalva Dec. ¶ 5.)

January 2009

Grijalva did not work on January 29, 2009, and was not on the premises. (Grijalva Dec. ¶ 10.) On January 30, 2009, staff members including Grijalva conducted a random search of Plaintiff's bed area at approximately 1:30 p.m. (Grijalva Dec. ¶ 11; ECF No. 31-4, Ex. D p. 2.) Plaintiff was verbally aggressive and he lunged at staff. (Id.)  Grijalva did not attack Plaintiff, nor did Grijalva cause him physical harm. (Grijalva Dec. ¶ 11.) Plaintiff admitted that he had startled staff member Stargaard during the search by yelling behind him; hospital and police incident reports were prepared, and Sanzberro determined that the unit staff acted appropriately. (Sanzberro Dec. ¶ 10; ECF No. 31-4, Ex. D pp. 2-10.)

May 2009

Jose Perez was not at CSH on May 17, 2009 and May 18, 2009, as those were his days off. (Perez Dec. ¶ 3.)

At 8:45 on the morning of May 18, 2009, psychiatric technician Rubalcava conducted a search of Plaintiff's living area and found five pounds of Pruno, a clear bottle with Pruno liquid, along with fruit and bread typically used to make the alcohol. (Sanzberro Dec. ¶ 14; ECF No. 31-4, Ex. D p. 19.) Plaintiff first refused to get out of bed, and then threw a cup of clear liquid at Grijalva; Plaintiff exclaimed "Take that motherfucker!" (Sanzberro Dec. ¶ 15; Grijalva Dec. ¶ 14; ECF No. 31-5, Plaintiff's Dep. pp. 19-20.)  Plaintiff had a clenched fist and flushed face - staff activated the red light

1  alarm and Plaintiff charged at Grijalva. (Sanzberro Dec. ¶ 15; Grijalva Dec. ¶ 14, ECF No. 31-4, Ex.

2  D, pp. 19-20.)

3         Due to this aggression towards staff, Plaintiff was determined to present a danger to others

4  ("DTO"). (Sanzberro Dec. ¶ 16; Grijalva Dec. ¶ 15.)  Pursuant to Physician's Orders by Dr. Gill,

5  Plaintiff was placed in a seclusion room at or about 9 a.m. (Sanzberro Dec. ¶ 16.) Plaintiff was subject

6  to a pat-down for safety prior to entering room seclusion, in accordance with hospital policy. (Grijalva

7  Dec. ¶ 16; ECF No. 31-5, Plaintiff's Dep. p. 22-23.)  Plaintiff was not strip-searched. (Grijalva Dec. ¶

8  16.) A one-to-one observation was initiated, where Rogers was visible in the room at all times, and

9  staff recorded observation entries in the IDN every 15-30 minutes. (Sanzberro Dec. ¶ 16.) Under the

10  terms of the seclusion policy, Plaintiff could not be released until he showed no danger to others by

11  remaining calm and not threatening others. (Sanzberro Dec. ¶ 16; ECF No. 31-5, Ex. D pp. 21-35.)

12         At 10:47 a.m., staff entered the seclusion room to inform Plaintiff that he had met the release

13  criteria and could leave the seclusion room. (Sanzberro Dec. ¶ 17.) Plaintiff yelled "fuck you" at staff

14  and then began to choke himself using his t-shirt. (Sanzberro Dec. ¶ 17; Grijalva Dec. ¶ 18.) Staff RN,

15  V. Francis, observed that Plaintiff's skin color began to change to light blue. (Sanzberro Dec. ¶ 17.)

16  Staff used the cut-down scissors to remove Plaintiff's shirt from around his neck; medical, psychiatric

17  and police services were notified. (Sanzberro Dec. ¶ 17; Grijalva Dec. ¶ 18; ECF No. 31-4, Ex. D, p.

18  27.)

19         At or about 11 a.m., Plaintiff was put in five point restraints as he was deemed a danger to

20  himself ("DTS") as well as to others. (Sanzberro Dec. ¶ 17; Grijalva Dec. ¶ 19.)  Staff psychologist

21  Dr. Gill confirmed that staff was justified to use the seclusion room and restraints, on the basis of

22  Plaintiff's threatening and violent behavior.  (Sanzberro Dec. ¶ 17; ECF No. 31-4, Ex. D pp. 21, 25-

23  28.)

24         A staff nurse attempted to take Plaintiff's vital signs; Plaintiff became combative and

25  uncooperative, and yelled obscenities at the nurse; Plaintiff continued to yell and combat staff, and

26  tried to bite at staff which prevented staff from drawing the ordered labs. (Sanzberro Dec. ¶ 19; ECF

27  No. 31-4, Ex. D pp. 29-30.)

28

9

At or about 2:48 p.m., Plaintiff was removed from the five point restraints. (Sanzberro Dec. ¶ 20; Grijalva Dec. ¶ 20.) Several staff attempted to support Plaintiff to help him walk around the room. (Id.) Plaintiff again began cursing at staff, and then appeared to intentionally fall on the floor in attempt to harm himself. (Id.) Plaintiff sustained an abrasion on the side of his head as a result of the fall and was placed back in the five point restraints. (Id.) At 3 p.m., Dr. Gill ordered 5 mg of Haldol be administered as an emergency procedure, in order to calm down Plaintiff. (Sanzberro Dec. ¶ 20; ECF No. 31-4, Ex. D pp. 30-33.) The Haldol was administered by RN Francis at 3:45 p.m. (Sanzberro Dec. ¶ 22; ECF No. 31-4, Ex. D p. 31.)

At 5:25 p.m. on May 18, 2009, Plaintiff was released from the five point restraints. (Sanzberro Dec. ¶ 22.)  Plaintiff continued to curse at and threaten Grijalva. (Sanzberro Dec. ¶ 22; Grijalva Dec. ¶ 21; ECF No. 31-4, Ex. P. 34.)  Plaintiff remained in line of sight observation until May 20th, without further signs of self-harm or symptoms of distress. (Sanzberro Dec. ¶ 22; ECF No. 31-4, Ex. D pp. 34-44.)

On May 19, 2009, Plaintiff refused to complete a physical exam, and refused to speak with psychologist Dr. Gill. (Sanzberro Dec. ¶ 23; ECF No. 31-4, Ex. D p. 40.)

On May 21, 2009, a treatment team meeting was convened to address Plaintiff's allegations that he was physically abused by staff who held him down to put him in the five point restraints, and allegations of abuse while attempting to complete a blood draw; Plaintiff refused to attend the meeting. (Sanzberro Decl. ¶ 24.) After interviewing the staff involved and reviewing the records, it was determined that Plaintiff's claims were not factual. (Sanzberro Decl. ¶ 24; ECF No. 31-4, Ex. D pp. 45-46.) The psychologist and Hospital Police Services were both notified. (Sanzberro Decl. ¶ 24.)

Strip Search

Sanzberro reviewed the detailed records of staff observations from Plaintiff's period of seclusion and five point restraints from May 17-21, 2009, and determined that there was no opportunity for Grijalva to have assaulted patient Plaintiff in the manner alleged in the complaint. (Sanzberro Decl. ¶ 25.) After Plaintiff's seclusion and restraint, Plaintiff complained that he had been held down by staff with their knees in order to draw blood. (Id.) Sanzberro did not receive a complaint from Plaintiff of a sexual assault nor of a strip search. (Sanzberro Decl. ¶ 25; ECF No. 31-4, Ex. D pp.

10

45-46.)  Grijalva did not inappropriately touch Plaintiff; Grijalva did not sexually assault Plaintiff. (Grijalva Dec. ¶ 17.)

Patients are rarely strip-searched at CSH, and only if staff have cause to believe the search would reveal dangerous contraband. (Sanzberro Decl. ¶ 26.) In the event that a patient must be put in five-point restraints, his clothing may be limited to a shirt and boxers for his safety, but he is not strip searched.  (Sanzberro Decl. ¶ 26; Perez Dec. ¶ 12.)

When asked about the strip-search allegation, Rogers testified in his deposition that a staff member "Darla" held him down while "Chris came around and started searching me. He searched everywhere, he searched my armpit, everywhere, and he pulled down my pants, my trousers, and my underwear and searched me everywhere" in the presence of several people. (ECF No. 31-5, Plaintiff's Dep. pp. 23-25.)

Involuntary Medication

Psychotropic medications at CSH can be administered by injection, but only pursuant to physicians' orders. (Sanzberro Decl. ¶ 27; Perez Dec. ¶ 13.) In emergency situations when a patient is at risk of harming himself or others, a physician may order medications such as Haldol or Ativan to be administered intramuscular. (Id.)

*Plaintiff's Statement*

Plaintiff elected not to submit a statement of undisputed facts contending that "it is plain that plaintiff and defendants do not agree on any matter relevant to this case."  (ECF No. 25, p. 2.) Plaintiff argues that Defendants Sanzberro and Grijalva have admitted to forcibly taking blood from Plaintiff and have admitted to harassing and assaulting Plaintiff by repeatedly waking him up for excessive routine searches of his bed area.  Plaintiff also claims that it is apparent "that the defendants have falsified plaintiff's hospital records and files" to paint him as a "violent madman."  (ECF No. 35, p. 10.)  Plaintiff further contends that defendants' declarations are self-serving and there is no credible evidence contradicting the allegations in his complaint.  (ECF No. 35, p. 11.)

///

///

///

1    **III.    Discussion**

2          **A.   Search and Seizure**

3          Plaintiff currently is confined pursuant to California's SVP Act.  The Fourth Amendment right

4    to be secure against unreasonable searches and seizures extends to those persons confined as SVPs.

5    Hydrick v. Hunter, 500 F.3d 978, 993 (9th Cir. 2007), vacated on other grounds, --- U.S. ---, 129 S.Ct.

6    2431, 174 L.Ed.2d 226 (2009).  The reasonableness of a particular search or seizure is determined by

7    reference to the detention context. Id. "Whether a search is reasonable is determined by assessing, on

8    the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree

9    to which it is needed for the promotion of legitimate governmental interests." Samson v. California,

10   547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (internal quotation marks omitted). Civil

11   detainees have "a diminished expectation of privacy after commitment to a custodial facility." Bell v.

12   Wolfish, 441 U.S. 502, 557, 99 S.Ct. 1861, 1883 (1979). Legitimate concerns justifying searches and

13   seizures are "the safety and security of guards and others in the facility, order within the facility and

14   the efficiency of the facility's operations." Hydrick, 500 F.3d at 993 (internal quotation marks

15   omitted).  However, "a search or seizure that is arbitrary, retaliatory, or clearly exceeds the legitimate

16   purpose of detention" violates the Fourth Amendment. Id.

17         Plaintiff contends that Defendants violated his Fourth Amendment right to be free from

18   unreasonable searches and seizures when they searched his cell on January 29, 2009, January 31,

19   2009, March 3, 2009, and May 18, 2009.  Plaintiff does not provide any relevant evidence aside from

20   the allegations in his First Amended Complaint.  Although Plaintiff has submitted grainy pictures and

21   declarations, this evidence does not relate to the allegations at issue in this action.  (ECF No. 35, pp.

22   13-15, Declaration of Mark S. Sokolsky; pp. 16-17, Declaration of Chris Klein; pp. 18-29.)  Rather,

23   they concern an alleged search of "the quarters of the person assisting plaintiff in the prosecution of

24   this action."  (ECF No. 35, p. 5.)  Despite his complaints that all evidence to be used in this case was

25   stolen during that search, Plaintiff has not specified what that evidence consisted of, nor has he sought

26   a continuance or requested any additional discovery related to this action.

27         Plaintiff has not raised an issue of fact on his Fourth Amendment claim.  First, Plaintiff has not

28   presented any evidence that the searches themselves were unreasonable, with the exception of his

claims that he was a day sleeper and that the searches were excessive.  Four separate searches in a five month period appear to be normal incidents of Plaintiff's confinement.  See Bell, 441 U.S. at 557 ("No one can rationally doubt that room searches [of civil detainees] represent an appropriate security measure.... And even the most zealous advocate of prisoner's rights would not suggest that a warrant is required to conduct such a search.")

Second, Defendants have presented evidence that CSH's policy for conducting random searches is reasonably related to a legitimate government interest in maintaining institutional security and removing items of contraband.  (Sanzberro Dec. ¶ 5.)  Plaintiff's allegations that the policy violates the Fourth Amendments' prohibition against unreasonable searches and seizures are not supported.  See, e.g., Allen v. Mayberg, 2013 WL 3992016, *5 (E.D. Cal. Aug. 1, 2013) (finding that plaintiff could not proceed on allegations challenging CSH's search policy and finding that policy did not offend the constitution).  Plaintiff has failed to dispute that that the searches were conducted for a legitimate government purpose of preventing detainees from possessing contraband.  Hydrick, 500 F.3d at 993.

Third, Plaintiff complains of a search conducted by Defendants Perez and Grijalva on January 29, 2009.  However, Defendant Grijalva did not work on January 29, 2009.  (Grijalva Dec. ¶ 10.) There is no evidence to the contrary.  Therefore, no reasonable jury could conclude that Defendants Grijalva and Perez jointly conducted a search in violation of the Fourth Amendment.

Fourth, Plaintiff complains of a search on January 31, 2009.  (First Am. Compl., p. 4.) However, the undisputed evidence reflects that Plaintiff's room was searched on January 30, 2009, not January 31, by Defendants Grijalva and Perez.  (Grijalva Dec. ¶ 11; ECF No. 31-4, Ex. D p. 2.) At that time, contraband was found and removed from Plaintiff's room.  (ECF No. 31-4, Ex. D p. 2.)  Plaintiff also complains of a search on March 3, 2009.  (First Am. Compl., p. 32.)  Plaintiff has not presented evidence demonstrating that either of these searches failed to comply with CSH policy or that the searches were not necessary for maintaining the institution's safety and security.  Indeed, Plaintiff has not addressed evidence that contraband items, such as pruno, have been confiscated from him on multiple occasions, including on January 31, 2009.  (Perez Dec. ¶¶ 7-8; Grijalva Dec. ¶¶ 13, 14; ECF

No. 31-4, Ex. D pp. 2, 12-13, 19-21.)  Plaintiff's conclusory assertions that his "hospital records have been tampered with and fabricated" are not sufficient to defeat summary judgment.

Fifth, Plaintiff complains of the room search conducted on May 18, 2009.  (First Am. Compl. p. 39.)  However, Defendants have presented evidence that the search was conducted by psychiatric technician Rubalcava, not Defendants.  (Sanzberro Dec. ¶ 14; ECF No. 31-4, Ex. D p. 19.)  Further, Defendants also have presented evidence that as a result of the search of Plaintiff's living area the psychiatric technician found five pounds of pruno and other related implements for making and consuming pruno.  (Sanzberro Dec. ¶ 14; ECF No. 31-4, Ex. D pp. 19-20.)  Plaintiff has not presented evidence to raise a genuine dispute of fact regarding the reasonableness of the search.  In other words, Plaintiff has failed to demonstrate that the search was *not* needed for the promotion of legitimate governmental interests, namely the safety and security of the institution by seizure of contraband.

Finally, Plaintiff's complaint contains no allegations naming Defendant Sanzberro as a participant in the searches and alleged seizure of property.  Plaintiff also has not presented any evidence in opposition to the motion for summary judgment to create a triable issue of fact regarding Defendant Sanzberro's participation in the searches.  To the extent Plaintiff is attempting to attribute liability to Defendant Sanzberro based on a theory of respondeat superior, he may not do so.  Respondeat superior is inapplicable in § 1983 actions.  Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009) (Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior).

Based on the foregoing, the Court finds that defendants are entitled to judgment as a matter of law on Plaintiff's Fourth Amendment search and seizure claim.

**B.  Excessive Force**

Plaintiff complains that Defendant Grijalva and other staff members tackled Plaintiff and placed him in restraints in a seclusion room, and involuntarily drew blood and administered medications to him in violation of his rights under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment prohibits the use of excessive force that amounts to punishment. Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1197 (9th Cir. 2002)

14

1   (citing Graham v. Connor, 490 U.S. 386, 395 n.1 0 (1989)).  Under the Fourth Amendment, the

2   "objective reasonableness" standard is used to analyze claims of excessive force.  Graham, 490 U.S. at

3   388.  In determining whether the use of force was reasonable, the Court must analyze the facts from

4   the viewpoint of a reasonable official on the scene, "rather than with the 20/20 vision of hindsight."

5   Gibson, 290 F.3d at 1197 (quoting Graham, 490 U.S. at 396).  The analysis must take consideration of

6   the fact that person "'are often forced to make split-second judgments-in circumstances that are tense,

7   uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.'"

8   Id. at 1197-98 (quoting Graham, 490 U.S. at 396-97).

9          The undisputed evidence indicates that on May 18, 2009, Plaintiff became aggressive to staff

10  by using profanity, throwing a cup of clear liquid at staff, clenching his fist and charging staff.

11  (Sanzberro Dec. ¶ 15; Grijalva Dec. ¶ 14, ECF No. 31-4, Ex. D, pp. 19-20.)  Based on his

12  aggressiveness, Plaintiff was determined to present a danger to others.  (Sanzberro Dec. ¶ 16; Grijalva

13  Dec. ¶ 15; ECF No. 31-4, p. 21.).  Plaintiff was then placed in a seclusion room based on the orders of

14  a physician.  (Sanzberro Dec. ¶ 16; ECF No. 31-4, p. 23.)  Plaintiff continued to be aggressive to staff

15  and was placed in five point restraints. (Sanzberro Dec. ¶ 17.)  Plaintiff could not be released until he

16  showed no danger to others by remaining calm and not threatening others. (Sanzberro Dec. ¶ 16; ECF

17  No. 31-5, Ex. D pp. 21-35.)

18         There is no dispute that Plaintiff was aggressive to staff members and, at various points, a

19  danger to himself and others, requiring his placement in seclusion and the use of restraints.  (Sanzberro

20  Dec. ¶ 17; ECF No. 31-4, Ex. D pp. 21, 25-28.)  Plaintiff has not raised a triable issue regarding the

21  necessity of placing him in a seclusion room, conducting a pat-down search and using five-point

22  restraints.

23         The undisputed evidence also reflects that Plaintiff was subjected to a pat down for safety prior

24  to entering the seclusion room pursuant to hospital policy.  (Grijalva Dec. ¶ 16; ECF No. 31-5,

25  Plaintiff's Dep. p. 22-23.)  Plaintiff has challenged the pat-down search by claiming that Defendant

26  Grijalva strip searched him and, in essence, sexually assaulted him.  However, the undisputed

27  evidence is that Plaintiff was not strip searched and there was no opportunity for Defendant Grijalva to

28  assault Plaintiff in the manner alleged.  (Sanzberro Dec. ¶ 25; ECF No. 31-4, Ex. D pp. 45-46.)

1    Plaintiff's own deposition testimony does not include allegations of such a strip search by Defendant

2    Grijalva, nor did Plaintiff complain of a sexual assault by Defendant Grijalva. (ECF No. 31-4, pp. 46-

3    47; ECF No. 31-5, Plaintiff's Dep. pp. 23:4-25:8.)

4              *Involuntary Administration of Medication/Drawing of Blood*

5              Plaintiff complains that Defendant Grijalva and other staff members involuntarily drew blood

6    and medicated him.  However, the undisputed evidence demonstrates that none of the defendants,

7    including Defendant Grijalva, participated in the withdrawing of blood or administration of

8    medication at issue.  According to the evidence, CSH staff members were unable to complete a blood

9    draw based on Plaintiff's aggressive behavior.  (ECF No. 31-4, pp. 30-31.)  The undisputed evidence

10   also demonstrates that Dr. Gill ordered a Haldol injection, which was administered by RN Francis on

11   May 18, 2009.  (UMF No. 72; ECF No. 31-4, pp. 32-33.)

12             Based on the undisputed evidence, Defendants are entitled to summary judgment on this claim.

13   Plaintiff's blood was not withdrawn and Defendants did not participate in the administration of Haldol

14   Iqbal, 129 S. Ct. 1948.

15             *Punitive Conditions*

16             Plaintiff complains of the conditions of his seclusion, including the coldness of the seclusion

17   room and being forced to urinate on the floor.  To satisfy substantive due process requirements, the

18   conditions of confinement imposed on civil detainees cannot be punitive.  Jones, 393 F.3d at 931-32.

19   Here, the undisputed evidence reflects that during the course of his seclusion, Plaintiff was monitored

20   regularly, including periodic checks approximately every fifteen to thirty minutes.  (ECF No. 31-4, pp.

21   25-32.)  There is no indication in any of these records that Plaintiff complained of or otherwise sought

22   assistance related to coldness or other conditions.  Rather, he repeatedly rejected staff nurse efforts to

23   assess him and attempted to choke himself with his shirt.  (ECF No. 31-4, pp. 25-29, 30.)  Although

24   the evidence indicates that Plaintiff urinated on the floor, there is no suggestion that he asked for or

25   requested assistance.  (ECF No. 31-4, p. 32.)

26             Based on the above, the Court concludes that Defendants are entitled to summary judgment on

27   Plaintiff's claims against them for violations of the Fourth Amendment and the Due Process Clause of

28

1  the Fourteenth Amendment.  As the Court has determined that there have been no constitutional

2  violations, it is unnecessary to reach Defendants' claims of qualified immunity.

3  **IV.      Conclusion and Order**

4          For the reasons discussed above, IT IS HEREBY ORDERED as follows:

5          1.  Defendants' motion for summary judgment, filed on August 10, 2012, is GRANTED;

6          2.  The Clerk of the Court is directed to enter judgment in favor of Defendants Grijalva, Perez

7              and Sanzberro and against Plaintiff; and

8          3.  The Clerk is directed to close this file.

9

10  IT IS SO ORDERED.

11      Dated:   __October 1, 2013__              ___/s/ Barbara A. McAuliffe___

12                                              UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28